FREEMAN v. MITCHELL.

1. CORPORATIONS—MORTGAGES—VALIDITY—DIRECTORS—FRAUD.

Where money represented by demand notes was lent to a corporation in good faith, the lender or his personal representatives had a right to demand and take security from the corporation for its repayment, even if the directors had some ulterior or sinister purpose in borrowing the money and in giving the mortgage.

2. SAME—EVIDENCE OF INDEBTEDNESS—SECRETARY—IMPLIED POWERS —RECITAL IN MORTGAGE.

Where the mortgage given to secure the demand notes recited that it was authorized by the directors, and the minutes also recite and admit the debt secured, any implied power of the secretary of the corporation to execute the notes in question was immaterial.

3. SAME—MORTGAGES—ASSIGNMENTS.

A mortgage given by the directors of a corporation to secure demand notes given from time to time for money borrowed, held, not an assignment within the meaning of the articles of association providing that no assignment of the property of the company for the benefit of creditors should be made by the directors unless authorized by a majority vote of all the stock issued.

4. SAME—MORTGAGES—VALIDITY—NOTES INDORSED BY DIRECTORS.

Said mortgage was not invalid simply because it secured the payment of notes indorsed by the directors.

5. SAME—FORECLOSURE—PRICE BID.

The contention that the price bid at the foreclosure sale was inadequate, *held*, not supported by the evidence.

6. WILLS—BEQUEST—CONSTRUCTION OF WILL.

A bequest of $400,000, to be satisfied by the assignment of evidence of indebtedness from a corporation to testator, *held*, not a bequest of all amounts owing to testator by said concern, but limited to the amount specified.

7. CORPORATIONS—MORTGAGES—FORECLOSURE—STOCKHOLDER'S SUIT TO SET ASIDE.

In a stockholder's suit to set aside the foreclosure of a mortgage given by the directors of a corporation on the ground that the mortgage indebtedness was in whole or in part fictitious, his right to relief depends upon some proof that the debt was not created at all or was created for some evil purpose shared by the mortgagee and the directors.

Appeal from Hillsdale; Hart (Burton L.), J., presiding. Submitted April 15, 1919. (Docket No. 38). Decided May 29, 1919. Rehearing denied July 18, 1919.

Bill by Amariah F. Freeman against Charles T. Mitchell and others, executors of the estate of William W. Mitchell, deceased, the Alamo Manufacturing Company and others to set aside the foreclosure of a mortgage against the defendant corporation. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*F. M. Freeman* (*Frank E. Jones* and *A. F. Freeman,* of counsel), for plaintiff.

*F. A. Lyon* (*Gaffney, Miltner & Millington,* of counsel), for defendants.

STONE, J. From an order dissolving a temporary injunction and denying a motion to dismiss the bill, cross-appeals were taken in this case, and the order below affirmed. *Freeman* v. *Mitchell,* 198 Mich. 207. The cause has been heard upon the merits and from

a decree dismissing the bill the plaintiff appeals. In his brief he says that he adopts,—

"in the most part, the concise and admirable 'Findings of Facts,' of the trial judge * * * except, in the few instances here noted, where we think the fact is really slightly different in the proofs or shaded somewhat differently than stated in such 'Findings,' or, in a few instances, stating omitted facts not appearing in the findings, which materially bear upon the issues here in suit."

The findings of fact referred to, filed July 23, 1918, are the following:

"This is an action commenced by the plaintiff to have certain mortgage foreclosure proceedings set aside, and the mortgage, which was the basis for the same, held for naught.

"The bill, in substance, alleges that the claimed mortgage indebtedness was, in whole or in part, fictitious; that the property, covered by the mortgage, was bid off at an insignificant figure; that the whole transaction was based upon fraud, and was the result of conspiracy.

"The court finds the following facts to be established on the hearing:

"1. That on April 25, 1901, the Alamo Manufacturing Company, of Hillsdale, Michigan, was incorporated with the capital stock of $25,000, divided into 2,500 shares each of the par value of $10; that $24,500 of the capital stock was paid for and the term of the corporation was to be for a period of 30 years; the articles of incorporation also contained the following: 'Article 6½—No assignment of the property of this company for the benefit of creditors, shall be made by the board of directors, unless the same shall first have been authorized by a majority vote of all the stock issued.'

"2. That in 1902, the capital stock was increased from $25,000 to $75,000. In February, 1903, the capital stock was increased from $75,000 to $150,000. In August, 1903, the capital stock was again increased from $150,000 to $200,000, divided into $50,000 preferred stock and $150,000 common stock. In Jan-

uary, 1904, the capital stock was increased from $200,-000 to $500,000, of which $350,000 was common stock and $150,000 was preferred stock. In 1907, the capital stock was again increased from $500,000 to $600,-000, of which $350,000 was common stock and $250,-000 was preferred stock. All of the preferred stock, or at least outside of the very commencement, was to pay 7 per cent. on the investment, with interest to be paid semi-annually. That no changes were made in the amount of the capital stock since its increase to $600,000.

"3. That all of the money realized from the sale of such common and preferred stock as was sold was used in the conduct of the business by the company, there being no evidence that any of it was diverted to outside channels.

"4. Plaintiff, in 1908, became the owner of $3,000 common stock and $1,000 preferred stock, having acquired the same from Franklin Bushman at a cost of $2,800, or thereabouts. At time of, or just previous to his purchase, which was after all increases of capital stock had been made by the company, plaintiff learned the preferred stock was paying dividends, but the common stock was not. Plaintiff received 7 per cent. dividends on his preferred stock until September, 1913, when the company failed to pay any dividends on its preferred stock, and it has never paid any thereon since that time.

"5. The company started to manufacture gas engines, that being the purpose of its incorporation. It seemed to be in its experimental stage and kept using in the business and for the payment of dividends, the money derived from the business and the sale of stock, and what it could borrow, until 1909 or 1910. At these later dates, it had exhausted its credit with local banks and local men and was greatly in debt, and Mr. Wade, of the company, went to Cadillac, Michigan, to see one W. W. Mitchell, an old resident of Hillsdale and a brother-in-law of Dr. W. H. Sawyer, who is director and stockholder of the company.

"6. W. W. Mitchell, from or about 1909 or 1910, began to loan the company money and various sums from time to time, until at the time of his death, which was November 8, 1915, the Alamo Manufac-

turing Company owed him, on demand notes, for money loaned, the sum of $797,500; on book accounts, $39,719.78; and money loaned through his agent, designated as the Hillsdale Investment Company, $64,-955. The mortgage notes were all signed by the Alamo Manufacturing Company, and indorsed by the directors of the company, among the indorsers being Dr. W. H. Sawyer, and Frank A. Lyon, the attorney hereinafter referred to. Since the death of W. W. Mitchell and up to this time, the executors of his estate have loaned the company other money, and paid all of its known creditors, advancing therefor the sum of $207,198.85, making the sum total paid out by W. W. Mitchell and his estate for the use of this company, the sum of $1,109,373.63. There is no evidence that this money was not received and used by the company, and it would appear to me, if Mitchell had not come to the rescue, dividends would not have been paid on the preferred stock as long as they were, and all of the stock would have been worthless long before it was.

"7. W. W. Mitchell was not a director of the company and never bought any stock in the company, but after he began to loan to the company, one $10 share of stock was sent to him as a Christmas present.

"8. Annual reports were filed with the secretary of State, that from 1906 to 1915, those produced on the hearing were not all correct; the first few of these reports show an indebtedness to Dr. Sawyer and his wife, who were also directors of the company, but the later ones did not, and none of them showed the Mitchell indebtedness; Mitchell, or his estate, had nothing to do with these reports, nor does the evidence establish that he, or his estate, had any knowledge of them, or their contents.

"9. An effort was made, from time to time, by W. W. Mitchell to collect, or at least reduce his indebtedness; this was unsuccessful up to, at least, the time of his death. On October 14, 1913, the company authorized a $400,000 bond issue, executed by a trust mortgage, its object being to take care of the Mitchell indebtedness, or at least a portion of it, and the trust mortgage was at once put on record, but after consultation with the then attorney general, the Honor-

able Grant Fellows, who by virtue of the law, was also a member of the Securities Commission, the company was informed the attorney general would not consent to this issue, and the bonds were not delivered.

"10. After the death of W. W. Mitchell, and on January 10, 1916, a mortgage in usual form was executed and delivered by the Alamo Manufacturing Company in the sum of $250,000, and for the purpose of securing $250,000 worth of these demand notes. This mortgage covered all of the real and personal property of said company. The mortgage provided that if default was made in the payment of the $250,-000 and interest for a period of ten days, all due thereon should at once be due and payable. The board of directors held a meeting at the home of Frank A. Lyon, on January 10, 1916, Mr. Lyon being an attorney and having been ill, which resulted in the meeting being held at his home. The company had twelve directors, but some two or more had resigned, and this meeting was attended by eight directors of the company, and among those present being Dr. W. H. Sawyer and Frank A. Lyon, the attorney. The directors who were present all voted for and signed the resolution which authorized the mortgage. The mortgage had already been prepared by Attorney Lyon and was executed at the close of the meeting. At the time the mortgage was given, Attorney Frank A. Lyon, acting for the Mitchell estate, was holding 19,787 shares of stock as trustee for all the stockholders. This came about when the capital stock was increased, and this increase was voted to the stockholders as a declared dividend; and became trustee-stock held by Mr. Lyon, as trustee, to be under the control of the board of directors for the benefit of the company. Attorney Lyon was also a director of the company at the time of the execution of the mortgage, and was also an indorser on some, if not all, of said notes, and he acted for the Alamo Manufacturing Company at the time, in the preparation of the mortgage, and Mr. Lyon had acted for it as an attorney, on previous occasions, but he had no regular retainer fee from the company, and only acted as its attorney when called upon to do so. At this same meeting the $400,-

000 bond issue was taken up and the bonds ordered destroyed and the trust mortgage to be released of record, which was afterwards done; the mortgage in question was acknowledged before Frank A. Lyon, as notary public, was witnessed by F. A. Lyon and George E. Tubbs, both being stockholders and indorsers on said notes. This mortgage was put on record January 11, 1916, by William Prideaux, another stockholder and director of said company, and also an indorser on said notes, and now in the employ of the Alamo Engine Company, which is a successor to the former company. After the mortgage was recorded, Mr. Prideaux delivered the mortgage to the executors of the Mitchell estate. As far as Mr. Lyon recollects, this mortgage was handed to him or delivered to him for foreclosure by either Dr. Sawyer or Mr. Prideaux.

"11. March 1, 1916, proceedings were commenced in the Hillsdale circuit court, in chancery, to foreclose said mortgage, the proceedings being instituted by the executors and executrix of the Mitchell estate, with Frank A. Lyon, as their attorney. In May, 1916, a decree was made in said matter finding the amount due and if not paid, ordering the premises sold. This was a default decree, the defendant, the Alamo Manufacturing Company, not appearing, service of summons having been made on William Prideaux, manager and president of the Alamo Manufacturing Company at that time. On October 23, 1916, the property covered by the mortgage was sold under said decree and was bid in by the executors and executrix of the W. W. Mitchell estate in the sum of $289,000, that being the amount for principal, interest, and expenses due to that date. No bidders bid on it, except Mr. Lyon, who was acting for the Mitchell estate. The Mitchell estate would have bid $300,000 but no more for the property. No defects are pointed out in the evidence in the regularity of the proceedings or sale. Redemption period extended to April 23, 1917. No redemption took place. After this sale, the board of directors, and I think it was on November 25, 1916, passed a resolution leasing the property or at least authorizing the Mitchell estate to operate the plant during redemption period for $500 a month. This rental money was to be credited on other indebtedness

owing to the Mitchell estate by the Alamo Manufacturing Company. No evidence was offered to show the bid of $289,000 was not the fair value of the property sold. But I will now (August 2, 1918) amend this finding and additionally state that the report of the company to the secretary of State for 1915, shows:

| | |
|---|---:|
| Real estate used in its business was valued at | $63,141.28 |
| Goods, chattels, merchandise, material and other tangible property | 191,620.12 |
| Cash on hand, including deposit in banks.. | 212.10 |
| Patent rights, copyrights, trademarks and formulas | 51,116.85 |
| Good will | 114,208.13 |
| Value of credits owing to the corporation... | 98,322.64 |
| And a total of | $517,621.12 |

"12. After this, another lease was made by the directors of the Alamo Manufacturing Company leasing to Charles T. Mitchell certain real estate of the said company, which had been covered by the said mortgage. The purpose of this lease was to allow the Mitchell estate to erect some new additions on the land which they had bid in at the sale, and to provide that if the Alamo Manufacturing Company redeemed from the mortgage sale, the Mitchell estate could have the benefit of these buildings for twenty years from the date of redemption by the payment of an annual rental of $1,000. This lease was to be operative if the premises were redeemed, and void if the premises were not redeemed. If the premises were redeemed, the rent was to be applied on paying the other indebtedness belonging to the Mitchell estate. After the execution of the lease mentioned in this paragraph of the findings, certain expensive buildings have been built and improvements placed on the premises by either the Mitchell estate, or the Alamo Engine Company, or by both.

"13. Certain preferred stock was redeemed during the life of the company to the amount of about $8,000. This stock was redeemed by virtue of an agreement given with it at the time it was sold giving the buyer the option to have his money back within certain

periods from the time he bought it, and this redemption money was paid out in accordance with said agreements.

"14. On May 10, 1917, a resolution was passed by the board of directors, which resolution was to dissolve the Alamo Manufacturing Company; this meeting was held in the office of attorney Lyon. No further proceedings were taken toward the dissolution except the sending of the notice of dissolution to the secretary of State and receiving a registry receipt from him.

"15. Wm. W. Mitchell left a will, dated September 24, 1910, and paragraph six of said will being, in substance, as follows:

"'Paragraph Sixth. Bequest to Walter H. Sawyer and Harriet Belle Sawyer, his wife, both of Hillsdale, Michigan, jointly, or to the survivor of the twain if one, and one only, of the twain shall survive me, the sum of $400,000 the same to be made and paid from my estate, or the income therefrom, and at such time or times as my executors may deem for the best interest of my estate, and as shall be equitable considering my directions herein in relation to other bequests and provisions relative thereto, as herein severally provided. But in the payment of this bequest, I will and direct that if at the time of my death I shall own, hold, or be obligated upon any evidence of indebtedness owing by the said Walter H. Sawyer or the said Harriet Belle Sawyer, or by any co-partnership, company, corporation, or concern, in which the said Walter H. Sawyer and the said Harriet Belle Sawyer, or either of them, is interested as co-partner, owner, stockholder, proprietor, or part proprietor, then any and all such evidence of indebtedness shall, as soon as may be after my death, be by my executors properly assigned and turned over to the said Walter H. Sawyer and Harriet Belle Sawyer, or to the then survivor of the twain, if such survivor shall survive me, and the face value of such evidence of indebtedness with any accumulated interest thereon, be applied upon treated as payment, to the extent of such face value, and interest, of the bequest in this paragraph sixth provided for.'

"16. I further find that Dr. W. H. Sawyer and wife both survived W. W. Mitchell, and that Dr. W. H. Sawyer was made one of the executors of said will, and that $400,000 of said Alamo Manufacturing Com-

pany notes have been set aside and listed for Doctor and Mrs. Sawyer by the executors and the executrix to pay the said legacy which is mentioned in said will, but have not yet been turned over to them.

"17. The affairs of the Alamo Manufacturing Company have been continued by the Mitchell estate and the Alamo Engine Company, respectively, since the sale, with the same working force and in the same office as before.

"18. The Alamo Engine Company was organized July 10, 1917, for a period of thirty years with a capitalization of $350,000, of which $300,000 is common stock and $50,000 is preferred stock. The stock has all been subscribed for, and the $300,000 of the common stock was paid for by turning in the property of the Alamo Manufacturing Company, and of the $50,000 preferred stock, $35,000 was paid in cash. The stockholders of the new company are Charles T. Mitchell, who has 1,000 shares of common stock and five hundred shares of preferred stock of the par value per share of $100; Ella Y. Mitchell has 1,000 shares of the common stock, and Marie Mitchell Berris has 1,000 shares of the common stock.

"19. Plaintiff never attended a stockholders' meeting, or a board of directors' meeting, since he acquired the stock. He made an investigation before he bought his stock, and thought the company was a good concern, and from time to time after he owned his stock he examined the annual reports on file at the county clerk's office when he happened to be in Hillsdale, which was once or twice a year. He knew of the cessation of his dividends on his preferred stock at the time they ceased."

Findings of law were also filed, reading:

"1. One of the first questions that presents itself is whether or not this mortgage was, in fact, a mortgage or, in fact, an assignment. The plaintiff contends that the instrument given here was, in effect, an assignment and prohibited by the articles of association, without it was authorized by the stockholders. I find that the instrument given was not an assignment but that it was a mortgage. It has all the terms of a mortgage, and it provided for a payment within

ten days and had all of the rights reserved to the mortgagors that are usually contained in mortgages. If it had been an assignment it would have passed the property over at once, without any power of statutory sale or without any right to redemption and the other incidents that follow mortgages. I think, under the Michigan decisions and the facts in this case, that this instrument was a mortgage, and I think this is controlled by the case of *Cluett* v. *Rosenthal,* 100 Mich. 193.

"2. The evidence in this case fails to convince me that the indebtedness covered by the mortgage was fictitious. In fact, all of the evidence shows that the Mitchell estate now has over one million dollars in this Alamo Manufacturing Company by way of loans and paying all of its outstanding indebtedness, and as far as I can determine, have advanced the money in good faith and to try and enable the company to make a success. There is no proof that this was a gift because notes were taken for the loans. There is no proof that the company did not have the money unless it would be considering the annual reports as proof and as to those the Mitchell estate would not be bound as there is no proof that either Mr. Mitchell in his lifetime, or his estate, had any knowledge of these reports, or their contents. The Alamo Manufacturing Company having had the benefit of the loans, it would seem unfair now to say that the claims of the Mitchell estate are fictitious.

"3. As to the property being sold at an insignificant figure, there is no evidence that the property did not bring all it was worth unless it might be said that the Mitchells would, if forced to, have paid $300,-000 for it. On such a sale as this, in size, a variation of $10,000 would not show that the property brought an insignificant figure, and even if the sale was now set aside and the property would now bring $300,000, and there is no evidence that it would bring more than that, the interest on the $289,000 from then until now would more than make up this difference.

"4. I do not find the evidence establishes conspiracy or fraud. If the Mitchell estate had been working and scheming to get this property, instead of making the mortgage for $250,000, they would have made it

for a much larger amount, in fact, so large an amount that there would have been no possibility of any one buying it at the sale, but it would seem to me the Mitchell estate desired its money more than anything else for they only made the mortgage for what they thought it would bring, and the evidence shows that they would have been willing to have taken $300,000 and let the property go and lost their other indebtedness. So, under these facts, I cannot find a conspiracy. Neither am I able to find fraud. It is true the facts on their face and unexplained might look suspicious. However, when the facts are explained, they sound reasonable and logical, at least, to me. There was a company heavily in debt, and being crowded by its creditors, it might hope, in ten days, to be able to stave off the matter, or it would know that before the premises were sold by foreclosure proceedings it would take some time, and it might hope that in that time, things would turn for the better, or that the property would bring a better figure at the sale. Under all these circumstances, I cannot say that the directors did not act in good faith. Under the rule, fraud is not to be lightly inferred but must be proven like other facts, it does not seem to me that plaintiff has complied with this rule. All of the increases in stock were made before those loans took place. It is true that some of the reports to the secretary of State were not correct, but no creditor has been injured, as every one has been paid in full, except the notes held by Dr. Sawyer and his wife, and they are not complaining in this suit. As to the stockholders, their money was already in, and the reports did not cause them to make their investment, and there has been no showing that the reports injured them. In fact, I think that Dr. Sawyer and Mr. Lyon, and some of the others, made every effort to make the company a success and try and make it pay out. Dr. Sawyer advanced his own money on several heavy loans. I think they did all they could until forced to meet the obligations. If the board of directors acted in good faith, I understand their action binds the company. I cannot find they did not act in good faith. If the company had made a success, no stockholder would have complained, because it did not, it is to be regretted, but it

is a chance that all stockholders take when they go into an enterprise.

"5. If the sale should be set aside and a receiver was appointed to take charge of the matters and the property resold, and if it should bring $11,000 more than it did, it would seem to me these assets would fail to meet the $750,000 of the Mitchell indebtedness outside of the mortgage indebtedness, and if the assets have to be used first to pay the debts, the assets would be exhausted and the stockholders no better off than they are now. In fact, I think the stockholders gained because they received dividends on their preferred stock from 1909 or 1910, to the latter part of 1913, which would not have happened, in my judgment, but for these loans. I think under all the evidence the company would have been the subject of bankruptcy long before, but for W. W. Mitchell. It is true that some other directors might have done better, but if those in charge did the best they could and used their best judgment, I do not think they are to be blamed.

"6. Quite a little is said in plaintiff's brief about the Supreme Court refusing to dismiss the bill on a motion and plaintiff contends that makes the law of this case. I agree with him that the Supreme Court has spoken and when they have spoken, it is the law of this case, but I read the opinion of the Supreme Court different than is claimed for by the plaintiff. The Supreme Court says the bill is good providing you establish the allegations in the bill, and among the allegations in the bill were that the indebtedness in the mortgage was without consideration, that the mortgage was fictitious, and that it was obtained by fraud. These were, as I view it, to be determined by the trial court under the evidence, and if the trial court found the evidence sustained the allegations of the bill, the bill would lie. I do not think the evidence sustained the allegations in the bill.

"7. The plaintiff carried the burden of proof to establish his allegations, and I do not think the plaintiff has done this.

"8. I think the bill of complaint should be dismissed but I think it should be without costs because, as I said before, the facts unexplained might lead one to think

that there was fraud, and I think for that reason, the plaintiff should not pay the costs."

Later, a petition for a rehearing and to permit an amendment of the bill was filed, and further findings were made and filed September 9, 1918, which are:

"A motion having been made for leave to file an amended bill of complaint and to have the case reopened, and having been granted, and the proofs having been taken and concluded on the amended bill of complaint and pleadings, the court finds that the will of the late Mr. Mitchell did not transfer all of the notes in question to Dr. W. H. Sawyer and wife.

"The court therefore finds that there was a consideration for the mortgage in this case, and his former findings in the case with this supplemental finding constitutes the court's entire findings in the case.

"The court, therefore, concludes that it should not change its former opinion, and that therefore the bill of complaint may be dismissed but without costs."

We are not impressed, and evidently counsel for plaintiff is not, that if the slight amendments to the findings suggested by him were made the issue would be in any manner changed or any different rules of decision be made applicable. What plaintiff really challenges are the legal conclusions which the court bases upon the facts found.

Although a rather complete statement of the nature of the suit, the charges made in the bill, and the relief prayed for will be found in the opinion of the court above referred to, it will be of value, at least will be convenient and tend to an understanding of this opinion to set out, briefly, and in a general way, some matters included in and some supplementing the findings made by the learned trial judge.

Organized in 1901, with a capital stock of $25,000, the Alamo Manufacturing Company had increased its capital and capital stock until, in 1907, the capital stock was $600,000—$350,000 common and $250,000

preferred. Its place of business was Hillsdale, Michigan. It was in 1908 that plaintiff became owner of $3,000 of common and $1,000 of preferred stock, paying for it about $2,800. The common stock was not paying dividends, the preferred paid 7 per cent. and plaintiff received his dividends until September, 1913, when a dividend on the preferred stock was passed, and none has ever since been paid. The only annual report of the corporation to the secretary of State appearing in the printed record purports to show the condition of the company December 31, 1915. It is therein recited that the subscribed stock is, common, $343,084; preferred, $161,570; all paid in in cash. The values of property recited therein are—

| | |
|---|---:|
| Real estate used in its business | $62,141.28 |
| Goods, chattels, merchandise, material and other tangible property | 191,620.12 |
| Credits owing to the corporation | 98,322.64 |
| Cash on hand | 212.10 |
| Besides this, patent rights, copyrights, trademarks and formulas are valued at | 51,116.85 |
| Good will at | 114,208.13 |

All liabilities are given as $212,569.57, none of which is secured by mortgage.

On the 10th day of January, 1916, the corporation gave a mortgage to the estate of W. W. Mitchell for $250,000, covering, in its terms, all of its real and personal property. It contains, by recital, a list of promissory notes theretofore given by the corporation to Mr. Mitchell, aggregating $250,000, each note bearing 6 per cent. interest, all payable on demand. The earliest note is one for $20,000, dated February 25, 1911, five others were dated in 1912, five in 1913, four in 1914, four in 1915. It is a condition of the mortgage that the said sum and interest be paid as demanded by the party of the second part, and if not paid within ten days the whole sum is made to be

due and payable immediately. The mortgage is signed by the corporation by its president and secretary, with the corporate seal, and it was recorded January 11, 1916, in the office of the register of deeds for Hillsdale county. A tax of $1,250 was paid. Mr. W. W. Mitchell had died November 8, 1915, and it is recited in the mortgage that the representatives of his estate demanded payment of the money or security by way of a first mortgage on the property, real and personal, of the corporation. If the records of the corporation, the notes produced in evidence, and the testimony offered upon the subject, are to be believed, the recital in the mortgage of demands owing to Mr. Mitchell did not include all outstanding notes.

It was the claim of the defendants made at the hearing that notes then outstanding amounted to $797,000, there being $547,500 of notes not included in the mortgage, all of which represented advances made by Mr. Mitchell or his estate to the corporation. It was a further contention that the additional sum of $207,198.85 was paid by the estate of Mr. Mitchell to general creditors of the Alamo Manufacturing Company. The notes, payment of which was secured by the mortgage, were indorsed by directors of the Alamo Manufacturing Company.

In March, 1916, proceedings were instituted in the circuit court for the county of Hillsdale, in chancery, to foreclose the mortgage by representatives of the Mitchell estate. A decree, *pro confesso,* was taken in May, 1916. The property was sold, under the decree, October 23, 1916, to the representatives of the estate for $289,000, the amount of principal, interest and expenses of foreclosure due at that date. The redemption period extended to April 23, 1917. There was no redemption. In May, 1917, the directors, by resolution, dissolved the corporation. No other proceedings to this end were taken, but notice of the dissolution was sent to the secretary of State.

Without using the imagination, it may be assumed that stockholders of this corporation who had no knowledge of this very large indebtedness to Mr. Mitchell, no part of which had ever been mentioned in the annual and verified reports of the corporation, who had never been consulted or advised with about the conduct of the business, were amazed at and felt outraged by the conduct of the board of directors, which had apparently stripped the corporation of property and made the shares of its stock worthless. Plaintiff has sought in this suit a remedy. He charges in his bill:

"4½. That at the time said mortgage was given as aforesaid, as plaintiff is informed which he believes to be true, William Prideaux was president and treasurer of said defendant company, W. H. Sawyer was its vice-president, and T. M. Sawyer (son of said W. H. Sawyer), was its secretary, and that its board of directors at that time consisted of Aaron Worthing, F. M. Stewart, C. E. Singer, Frank A. Lyon, M. D. O'Meara, William Prideaux and W. H. Sawyer; and that said Frank A. Lyon was and had been for a long time prior thereto, its attorney and adviser and generally recognized as such attorney and adviser.

"5. That at or before the time that the said mortgage was given as aforesaid, as this plaintiff has been informed which he believes to be true, no stockholders' meeting of defendant company had been called for the purpose of authorizing the giving of that mortgage nor had any notice been given to the stockholders generally of a meeting called for such a purpose, at least plaintiff positively avers none was given to him; and when such mortgage was given as aforesaid, as plaintiff is also informed and which he believes to be true, none of the general stockholders knew anything about the giving of such mortgage nor that there was any occasion or necessity therefor, at least this plaintiff had no such knowledge nor did he know anything about such mortgage until the month of August, 1916, as hereafter stated, nor did the general stockholders of defendant company, to this day, know of such mort-

gage as plaintiff verily believes. And, in this connection, plaintiff avers and charges, as he is advised which he also believes to be true, that in the giving of the mortgage by the president and secretary of defendant company, acting under the authority of its board of directors, and without the permit and authority of a regular convened meeting of its stockholders and the requisite number voting therefor was wholly without sanction of law, was unlawful and utterly void· and illegal and was a fraud upon the stockholders and this plaintiff.

"6. That on or about the 1st day of March, 1916, within the short space of 50 days from the time that that mortgage was given to said executors and executrix, they filed their bill of complaint in this court seeking to foreclose such mortgage and claiming at that time that there was $269,808.37 for· principal and interest due upon that mortgage and adopting the legal general or usual form and procedure incident to such a proceeding, as will appear by the files and records. of this court in such respect, reference being had thereto and made to form a part hereof for certainty. And: that such proceedings must have been conceived and: inspired as this plaintiff avers and charges on information and belief for a considerable time before said bill for foreclosure was filed and as this plaintiff also charges on information and belief same was at the very time the mortgage was given, and was therefore a species of fraud and conspiracy to cheat and defraud the general stockholders and this plaintiff and cut them and him off from further connection or relation to the properties of this defendant company and was likewise highly reprehensible and improper to be done. That said Frank A. Lyon appeared in that foreclosure proceedings, as the attorney of record for the plaintiff mortgagees in such foreclosure proceedings and that service of the writ of subpœna issued in that cause was had upon said William Prideaux, as treasurer of the defendant company and that he nor any one in behalf of the defendant company made no appearance whatever to such foreclosure proceedings nor entered any defense or protest thereto, but, rather. suffered default thereon and full sanction thereof, and whereupon the regular or usual

*pro confesso* order of default was entered, all of which will also appear by the records and files of this court in that cause to which reference is also made to form a part hereof. * * *

"And, in this connection, plaintiff avers and charges, upon information and belief which he believes to be true, that there is no such amount as stated properly as mortgage indebtedness nor as proper decree obligation against defendant company and that such mortgage is fraudulent and was 'conceived in sin and brought forth in iniquity' to cheat and defraud the stockholders of defendant company and gain titles away from defendant company and its stockholders and to the person or persons whom they might select or name to become the bidder or bidders at a foreclosure sale proceeding under such mortgage, well knowing that the small individual stockholder would not and would, in fact, be unable to protect himself against such a foreclosure proceeding, and thereby gain the title and ownership at an insignificant figure in comparison to the value of the property covered by the mortgage and it ought not to stand, for that reason and for the other reasons heretofore averred, as a binding obligation and instrument against defendant company to deplete and impair the value of the stockholders' certificates of stock in that company."

He charges, upon information and belief, that the mortgaged property was worth about $700,000. He prays for a decree setting aside the mortgage—

"(c) That the said decree of foreclosure be vacated; or, at least, plaintiff be permitted to make answer to the foreclosure bill of complaint, and, if necessary, that this bill of complaint may be regarded as a bill of revivor or review or in the nature thereof, or of such equity proceeding as this court shall decree just and equitable to preserve the rights of plaintiff.

"(d) That the sale made under said foreclosure proceedings upon said October 23, 1916, be set aside, vacated and altogether held for naught";

—that the circuit court commissioner's deed be canceled, and for other, including general, relief.

We held in *Freeman* v. *Mitchell, supra,* that the bill ought to be retained, answered and proofs taken, overruling the motion to dismiss. We are called upon now to determine whether the proofs sustain the charges made in the bill.

It must be kept in mind that plaintiff's position, from and on account of which he seeks a remedy, is the position of owner of the stock of the Alamo Manufacturing Company, the management of which company was annually committed by the stockholders to a board of directors. He has made the representatives of the Mitchell estate defendants, joining with them, as defendants, the Alamo Manufacturing Company and William Prideaux, Aaron Worthing, C. E. Singer, Frank A. Lyon, M. D. O'Meara, Frank M. Stewart and Walter H. Sawyer, who were directors of the Alamo Manufacturing Company when the mortgage was given.

The apparent position of the representatives of the Mitchell estate is an honest one. If it is admitted, or assumed, that Mr. Mitchell, having no sinister purpose, lent the money represented by the notes described in the mortgage to the Alamo Manufacturing Company, his right and that of his personal representatives to demand and take security from the Alamo Manufacturing Company for its repayment is clear. This is so even if the defendant directors had some ulterior or sinister purpose in borrowing the money and in giving the mortgage. And if no legal wrong was committed in giving and taking the security, or in enforcing it, there is nothing with which plaintiff may charge the representatives of the Mitchell estate which contributed to his loss. If the representatives of the Mitchell estate are discharged, all defendants must be discharged in this action, because there is no foundation in the pleadings for any judgment for plaintiff against the defendant directors. No

theory has been advanced according to which plaintiff can cómpel those defendants to restore the assets of the company or to recompense plaintiff.

If we understand the positions taken by plaintiff, they may be stated as follows: *First,* Mr. Mitchell did not lend the Alamo Manufacturing Company the money evidenced by the notes described in the mortgage; *second,* the notes do not appear to be given by authority, having been executed by the secretary of the corporation; *third,* the mortgage was in effect, in law and fact, an assignment for the benefit of a creditor, forbidden by article No. 6½ of the articles of association of the corporation in the words,—

"No assignment of the property of this company for the benefit of creditors, shall be made by the board of directors, unless the same shall first have been authorized by a majority vote of all the stock issued";

—*fourth,* the mortgage secured notes indorsed by directors of the corporation; *fifth,* the property was sold for an inadequate sum; *sixth,* all of the notes and evidences of indebtedness to Mitchell were by his will bequeathed to and became the property of Walter H. Sawyer and his wife Harriet, and were therefore not the property of the Mitchell estate.

Let us examine these points in their order.

*First.* We expected, naturally, that plaintiff would point out the evidence sustaining this position. He has not done so. The evidence, documentary and oral, supports the finding of the trial court. It supports, also, the finding that the money was, in some way or other, used in the business of the corporation.

*Second.* Defendants need not rely upon any implied power of the secretary of the corporation to execute the notes. They are listed in — described in — the mortgage, and the mortgage was authorized by the directors, whose minutes, also, recite and admit the debt secured.

*Third.* The mortgage was not an assignment within the meaning of the articles of association. Evidently, the articles distinguish an assignment from a mortgage. The notes secured were demand notes. They were outstanding and had been given from time to time. The instrument executed to secure payment of the notes necessarily secured payment of them according to their terms unless otherwise provided. It is in form a mortgage. The evidence that an assignment, an immediate passing of title, was intended is not persuasive.

*Fourth.* The mortgage was not invalid simply because it secured the payment of notes indorsed by the directors. *Webster* v. *Ypsilanti Canning Co.,* 149 Mich. 489. No creditor of the corporation is complaining.

*Fifth.* The evidence does not sustain the contention that the property was sold for an inadequate price. The purchasers would have given $300,000 if there had been other bids requiring so much to be given. There were no bidders other than the mortgagees. It is true that the reports of the corporation represent the value of all the assets to be considerably more than the sum bid at the sale. It is also true that the values put upon patents and good will are to be distinguished from the values of tangible property. The good will of a bankrupt concern cannot be accepted at the valuation put on it by optimistic or dishonest officials of the concern. In December, 1915, the value of tangible assets, including credits, was fixed in the annual report at $252,296.14.

*Sixth.* We construe the sixth paragraph of the will of Mr. Mitchell as bequeathing to Mr. Sawyer and his wife, or the survivor, $400,000, and no more. This bequest might be satisfied by delivering to the legatees $400,000 of the paper of the Alamo Manufacturing

Company owned by Mr. Mitchell. It did not become a bequest for $500,000 or $700,000 because at the time of his death Mr. Mitchell held so much of the paper of the company. The court found, upon undisputed evidence, that the representatives of the estate have selected demands due Mr. Mitchell from the defendant corporation to the amount of $400,000, to be used in discharge of the legacy.

We have not overlooked any of the circumstances pointed out by plaintiff as creating suspicion and perhaps affording apparent foundation for the charges of dishonesty made against defendants. We may agree with him that open and fair dealing required that the directors of this corporation should make and issue to stockholders a true statement of the affairs of the corporation, giving them—the stockholders—opportunity to determine whether to continue the borrowing of large sums of money or to dissolve the corporation, saving whatever sum it was possible to save. We may agree that the continued financing of the business by Mr. Mitchell is not to be explained by any ordinary rules of sound finance. The situation remains, and, as has been already said, in the last analysis plaintiff's right to relief depends upon some proof that the debt was not created at all or was created for some evil purpose shared by Mr. Mitchell and the directors. This proof is not supplied by showing mere business carelessness of the lender of the money or blind optimism or desperation of the directors. And it may be that Mr. Mitchell, having carelessly lent a large sum of money likely to be lost, was himself imbued with the idea that perhaps further advances would enable the corporation to succeed. We are impressed that for the most part the findings of the circuit court are sustained by the evidence, and the conclusions drawn inevitable.

The decree appealed from concludes with these words—

"That the plaintiff having proceeded in good faith in this cause, and the situation here complained of having been created by the defendants, shall recover costs to the amount of thirty-five dollars."

We affirm the decree; but in the face of this record are impressed that defendants should recover from plaintiff one taxable solicitor's fee and the cost of printing the brief.

BIRD, C. J., and MOORE, STEERE, BROOKE, and KUHN, JJ., concurred. OSTRANDER, J., did not sit. FELLOWS, J., took no part in the decision.